## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:18 cr 42

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM &** |
| BRYAN JAMISON WATTS, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Before the Court is Defendant Watts' Motion to Suppress Evidence. [# 25]. The Government filed a Response to the Motion to Suppress. [# 29]. Defendant filed a Reply to the Government's Response. [# 30]. The Court conducted a hearing and heard evidence and argument from the Government and Defendant. Having carefully considered the evidence, briefs, and arguments, the Court enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I.     Procedural Background

On April 3, 2018, the grand jury returned an indictment charging Defendant Watts with possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). [# 15]. On June 5, 2018, Defendant filed his Motion to Suppress. [# 25]. On June 12, 2018, the Government filed its Response to the Motion to Suppress. [# 29]. On June 18, 2018, Defendant filed a Reply to the Response. [# 30]. On July 12, 2018, the Court held a hearing on the Motion with the Government and Defendant Watts present.

In the Motion to Suppress, Defendant asserts that evidenced seized from his vehicle

was obtained in contravention of his Fourth Amendment rights; therefore, all evidence initially and subsequently obtained must be suppressed.

## II. Factual Background

### a. The DEA Investigation into Defendant Watts.

The Actors. Shaun Ziadie ("Ziadie") is the Group Supervisor of the Asheville U.S. Drug Enforcement Administration ("DEA") group. (T. 13–14, 157)[1] Task Force Officer Sonia Escobedo ("TFO Escobedo") was the DEA case manager of the investigation into Defendant. (T. 85) The Asheville DEA has ten agents who are from various agencies and organizations, including the Bureau of Indian Affairs, the Asheville Police Department, and the North Carolina Highway Patrol ("NCHP"). (T. 160)

Special Agent Billy Stites ("S/A Stites") is a special agent with the U.S. Bureau of Indian Affairs with over ten years of experience. (T. 123) Additionally, S/A Stites is a task force agent with the DEA with almost ten years of experience. (T. 123)

Trooper Chris Morgan ("Trooper Morgan") is a trooper with the NCHP. (T. 7) Since 2008, Trooper Morgan has been assigned to the Asheville Criminal Interdiction Unit ("CIU"), which is a unit within the NCHP. (T. 7) There are three CIUs in the state of North Carolina. (T. 7) Compared with a traditional trooper, CIU troopers are generally assigned a larger area to patrol and investigate. (T. 7) The Asheville CIU is a six-person team with three K-9 handlers. (T. 8) The CIU primarily works highway crime prevention—including

---

[1] "T." followed by a number is the page number of the transcript from the hearing held on July 12, 2018. [*See* # 32].

felony drug investigations, tracking and detaining wanted individuals, and other felony investigations. (T. 7) The CIU uses traffic violations as one way to make contact with individuals it is investigating. (T. 7–8) Due to its size, the CIU generally conducts its work as a team. (T.8) Much of the CIU's work is in concert with federal and other state agencies. (T. 8) For example, when asked to do so, the CIU will conduct traffic stops for other agencies. (T. 8)

The NCHP allows troopers to apply and serve a three-year rotation as a task force officer with the DEA. (T. 10) From 2014 to 2017, Trooper Morgan was a task force officer with the DEA. (T. 10–11) While a task force officer, Trooper Morgan gained experience in maintaining a full caseload and completing full drug investigations. (T. 10) During this time, Trooper Morgan acted as a liaison between the DEA and NCHP. (T. 11) While a task force officer, Trooper Morgan and S/A Stites got to know each other. (T. 31, 167) The two have since remained in contact after Trooper Morgan's rotation at the DEA ended. (T. 31, 167) In the course of Trooper Morgan's career he has stopped thousands of vehicles with many of those involving illegal drugs or narcotics. (T. 47)

The DEA Investigation. The State of Washington's DEA has been investigating a drug-trafficking organization ("the Organization") responsible for transporting marijuana to North and South Carolina. (T. 124) Washington's DEA based part of its investigation on information it obtained from a cooperating source. (T. 124) The source informed that there was a stash house with a large quantity of marijuana located in Asheville, NC. (T. 124) The Washington DEA contacted the North Carolina DEA to see about a cooperative investigation and introducing an undercover agent. (T. 124) The North Carolina DEA

assigned S/A Stites as the undercover agent. (T. 124) Using the cooperating source, S/A Stites' undercover identity and cellphone number were introduced to the Organization. (T. 124–25) S/A Stites' cover story was that he was "Joey," a North Carolina based distributor of marijuana and interested in making a deal. (T. 17, 125)

To obtain and preserve evidence, S/A Stites used a program on his cellphone that allowed him to do four things: 1) create a dummy cellphone number that would forward to his work cellphone; 2) securely record all incoming and outgoing phone calls with anyone who used the dummy number; 3) securely record all incoming and outgoing text and media messages from anyone who used the dummy number; 4) summarize and catalog into a spreadsheet all communication with anyone who had contacted the dummy number. (T. 125–27, 130) [*See* Gov't Ex. 4][2]

March 2, 2018. On March 2, 2018, S/A Stites received a call from a phone number with a 509 area code. (T. 125)[3] Upon answering, the caller appeared to be a male subject who identified himself as "Bryan." (T. 125) During the first contact between S/A Stites and Defendant, the two had a thinly veiled conversation regarding the sale of marijuana. [Gov't Ex. 17, Files 1, 2]. From terms such as "outdoors" versus "indoors," "hand trimmed," and pricing, S/A Stites was able to infer that the two were talking about marijuana. [Id.]; (T. 134–35, 141) There was discussion of sending a sample to a S/A Stites,

---

[2] "Gov't Ex." followed by a number is Government's Exhibit entered into evidence at the July 12, 2018, hearing.

[3] Through investigation, S/A Stites was later able to determine the 509 cellphone number belonged to Bryan Jameson Watts—the Defendant. (T. 129–30) In total, the phone calls between S/A Stites and Defendant amassed over 4.5 hours of recorded conversation. [*See* Gov't Ex. 17]

Defendant, however, stated he would instead text S/A Stites photographs of the marijuana. (T. 135); [*See* Gov't Exs. 5–13] After sending the photographs, Defendant texted a list of the three marijuana strains represented in the photos. (T. 142) S/A Stites responded that everything looked great, and he wished to make a deal. (T. 142)

After initial negotiations, Defendant and S/A Stites tentatively settled on a quantity of 100 pounds of marijuana. (T. 142–43) Thereafter, Defendant called S/A Stites to further discuss pricing and the possibility of increasing the quantity of marijuana to 200 pounds. (T. 143) [Gov't Ex. 17, Files 4, 5] Finally, Defendant and S/A Stites settled on 170 pounds of marijuana at $1,200 per pound. (T. 17, 144, 154) S/A Stites suggested the two of them conduct the deal at Harrah's Casino located in Cherokee, NC. (T. 144)

Throughout the rest of their March 2, 2018, conversations, S/A Stites discovered how Defendant planned to transport the marijuana across the country. (T. 145) Defendant said he would purchase a 2003 Chevrolet Duramax diesel truck with an extended cab and long bed. (T. 145, 149) Defendant stated he had bought the truck from a "retired military guy" and planned to keep the truck in that person's name. (T. 149) Defendant stated he would double-vacuum seal the marijuana and then place the sealed bags into large black garbage bags. (T. 145) [Gov't Ex. 17, File 3] The trash bags would be placed in the truck bed under a tonneau cover. (T. 145) [Gov't Ex. 17, File 3] Defendant stated he preferred to double-vacuum seal the product to prevent any marijuana smell from seeping. (T. 145) [Gov't Ex. 17, File 3] Defendant would then drive across the country to North Carolina. (T. 145) At one point, Defendant bragged that he was in the "commercial cannabis world." [Gov't Ex. 17, File 3]

March 4, 2018. During the morning of March 4, 2018, Defendant texted S/A Stites that he was on the road. (T. 147) Later that day, Defendant called S/A Stites and asked Stites if he would be able to sell Defendant's truck after dropping off the marijuana because Defendant wished to fly back to the West Coast. (T. 147) S/A Stites and Defendant loosely talked about price and commission for the sale. (T. 150) The truck had 177,000 miles on it, and Defendant had installed a car stereo system (allowing him to call handsfree to S/A Stites via Bluetooth). (T. 150)

Throughout the rest of March 4, 2018, Defendant and S/A Stites had other lengthy conversations covering various topics, including Defendant's marijuana business, Defendant's racing business, and Defendant's business selling supplements. (T. 148) At one point, Defendant mentioned that initially a partner was coming with him, however, that partner decided otherwise. (T. 148) In order to bolster the credibility of his undercover persona, S/A Stites stated he could get Defendant a room at Harrah's Casino hotel. (T. 149) S/A Stites worked with Harrah's to obtain a real confirmation to a phony room made in S/A Stites' undercover name. (T. 149)

From his experience, S/A Stites found it unusual that Defendant would travel alone and unarmed for this type of drug sale. (T. 154) S/A Stites had to plan for the possibility that Defendant could be armed, traveling with a partner (or a shadow), or both. (T. 154)

March 5, 2018. On March 5, 2018, Defendant called S/A Stites while on the road. (T. 150) Defendant indicated that he had spent the previous night in Cheyenne, WY. (T. 150) Again, the conversation turned to S/A Stites reselling the truck for Defendant. (T. 150) Then, Defendant stated he was not driving the truck that he had originally described

but a 2003 Chevrolet Silverado. (T. 16, 150–51) To help with the sale, Defendant texted S/A Stites a photo of the vehicle's exterior and a photo of the vehicle's interior. (T. 150–51) [Gov't Exs. 2, 14]

The two had other lengthy conversations that day, yet each conversation eventually returned to whether S/A Stites would be able to get the money together—$204,000—for the deal. (T. 153–54) Defendant stated he wanted the money banded together in increments of $10,000. (T. 154) During one conversation, Defendant told S/A Stites, "and if you f--- me over, there's people that are close by to you that could come visit you a couple times." [Gov't Ex. 17, file 6, 4:12–4:20]; (T. 26) Under these circumstances, S/A Stites remained unsure if Defendant was traveling with a partner or possibly meeting a partner in North Carolina. (T. 155–56) S/A Stites knew that the Organization had other contacts in North Carolina. (T. 155–56) With all of this in mind, S/A Stites interpreted Defendant's statement as a threat and forwarded this and all other information to his supervisors and other agents involved in the investigation. (T. 156)

Through further conversation, S/A Stites determined that Defendant planned to stay the night of March 5, 2018, in Nashville, TN. (T. 157) S/A Stites offered to book a room for Defendant (so that Defendant's location could be definitively verified). (T. 157) Defendant declined. (T. 157) Defendant stated he had a contact in Nashville who got him rooms "all the time." (T. 157) This statement further made S/A Stites question if Defendant was traveling alone. (T. 157) S/A Stites relayed this information to Group Supervisor Ziadie who then passed along the information to a DEA group supervisor in Tennessee named John Clayton ("GS Clayton"). (T. 157–58)

Attempting to coordinate with the DEA Tennessee office, Ziadie asked if that office could help with locating and tracking Defendant. (T. 157–58) For both March 5 and March 6, 2018, the Tennessee DEA office did not have the resources to help the Asheville DEA's investigation. (T. 158) GS Clayton, however, offered to personally help verify whether Defendant was staying at a particular hotel, if that detail could be discovered. (T. 158) S/A Stites found out that Defendant planned to stay at a new hotel in Nashville called the Cambria Suites. (T. 158) Defendant stated he would likely not make it to the hotel until after 3:00 a.m. (T. 159)

March 6, 2018. In the early hours of March 6, 2018, GS Clayton went to the parking lot of the Cambria Suites and saw the truck that matched the photo Defendant had texted S/A Stites. (T. 159) The truck was backed into a parking space obscuring the vehicle license plate and other registration information. (T. 159, 169) GS Clayton also saw another truck nearby that was similar to the photo and had an Oregon license plate. (T. 159–60) GS Clayton relayed this information to S/A Stites. (T. 160) Again, S/A Stites grew concerned that this other truck could be Defendant's partner or shadow. (T. 160)

S/A Stites told the Asheville DEA everything that had transpired up to this point. (T. 160) Ziadie told S/A Stites to coordinate with the NCHP's CIU to possibly conduct a traffic stop of Defendant. (T. 160–61, 168) Safety was the primary concern for having the CIU conduct a traffic stop. (T. 161) Based on past cases, the Asheville DEA had a growing concern that if S/A Stites did not show up to Harrah's Casino with $204,000, S/A Stites or innocent bystanders might be harmed. (T. 161–62) Further, DEA agents like S/A Stites and TFO Escobedo do not have vehicles designed to conduct traffic stops. (T. 180)

8

S/A Stites contacted the CIU to see if there was any availability to conduct a traffic stop. (T. 168–69) At that time, no exact date and time could be given because it remained uncertain when Defendant would arrive. (T. 168–69) S/A Stites told the CIU he would stay in contact. (T. 169)

The CIU determined Trooper Morgan would be the individual to conduct a "wall-off" traffic stop. (T. 169) A wall-off traffic stop is where an officer conducts a stop based on a traffic violation instead of probable cause or reasonable suspicion from a separate investigation. (T. 28–29) The hope is that the traffic violation stop leads to a search or arrest, which potentially allows the officer to 'discover' incriminating evidence connected to the separate investigation. (T. 28–29) This 'walls-off' a suspect into thinking his or her more sinister criminal activities were revealed based off a traffic violation instead of an investigation. (T. 29) It also 'walls-off' any confidential informants and undercover agents from a suspect's suspicion that they have informed on the suspect. (T. 29) The wall-off stop requires the officer act as if he or she does not know about the separate investigation and is simply performing a stop based on a traffic violation. (T. 30) The overarching goals are to protect both confidential informants and undercover agents and to protect the larger investigation. (T. 29)

Once it was decided Trooper Morgan would conduct the wall-off stop, S/A Stites began communicating directly with Morgan and relaying updates in the case. (T. 25, 44, 169) At some point, a collective decision was made that if Trooper Morgan were unable to pull Defendant over for a traffic violation, Trooper Morgan would pull Defendant over based on the DEA's investigation. (T. 180) Trooper Morgan and other agents believed,

9

based on the evidence provided by S/A Stites, they had probable cause to stop Defendant and search the vehicle. (T. 27, 79) Yet, this would reveal the larger investigation, so, it was determined to be a last resort. (T 60) While this decision was collectively made, S/A Stites did not directly order Trooper Morgan to pull over Defendant. (T. 192)

### b. The Morning Briefing Held on March 6, 2018, and Events Leading up to Defendant's Traffic Stop

Between 10:30 and 11:00 a.m., on March 6, 2018, Group Supervisor Ziadie led a briefing on the investigation into Defendant and the coordinated action the Asheville DEA planned to take in apprehending Defendant. (T. 13, 80, 165) S/A Stites had provided Ziadie the information for the briefing. (T. 165) The briefing was held at the Cherokee Indian Police Department. (T. 13–14) In attendance were all available troopers and other team members assisting with surveillance of Defendant. (T. 13) Specific attendees included, Trooper Morgan, Trooper Shannon Williamson, Trooper Matt Lowry, Trooper Grady McGraw, Trooper Michael Childress, Cherokee Indian Police officers, and SWAT officers. (T. 15, 51) S/A Stites was not present because he was already headed to Tennessee. (T. 15, 31, 165)

At the briefing, Ziadie distributed a photo of the Chevrolet Silverado Defendant was driving. (T. 16, 20) It was the same photo Defendant had sent S/A Stites earlier. (T. 16–17) Ziadie also distributed a photo of Defendant taken from his Facebook account. (T. 16, 19) Then Ziadie explained what the DEA investigation had uncovered about Defendant and his plan to transport marijuana across country. (T. 16, 19, 165–66) Ziadie explained the details leading up to Defendant staying in Nashville and GS Clayton observing two

similar trucks in the Cambria Suites parking lot. (T. 16) Because the truck thought to belong to Defendant had its license plate obscured, agents in Nashville had to wait until Defendant drove out of the hotel parking lot to reveal registration information. (T. 17) Then the Tennessee DEA would follow Defendant as he approached North Carolina. (T. 17, 170) Ziadie explained that S/A Stites and TFO Escobedo were already headed to Nashville, driving in separate cars, to pick up surveillance from GS Clayton. (T 170) Ziadie then gave out the radio channel the team would use during the traffic stop and possible arrest. (T. 18) Finally, Ziadie discussed contingency plans, including the use of a SWAT team if the traffic stop led to violence. (T. 18, 71) At no point did anyone seek a warrant from a tribal or federal magistrate judge after this briefing. (T. 87, 116–17)

When Defendant left the Cambria Suites on March 6, 2018, GS Clayton and another DEA agent were able to ascertain the vehicle's tag number. (T. 171) It revealed an Oregon license plate registered to an unknown person in Oregon. (T. 171) Both agents followed Defendant's truck as it headed to North Carolina. (T. 171) Due to the lack of manpower, no one in Nashville was able to keep sight on the other truck with Oregon plates in the Cambria Suites parking lot. (T. 171) The Tennessee DEA agents had to make a tough decision and decided to only follow the Defendant's truck. (T. 171) About halfway between Asheville and Nashville, S/A Stites and TFO Escobedo picked up surveillance of Defendant from the Nashville DEA agents. (T. 172) From this point on, S/A Stites remained in constant contact with Trooper Morgan via cellphone, relaying location updates in real time. (T. 172)

Near Kingston, TN, Defendant called S/A Stites. Defendant stated he was on his

way and, at some point, he needed to stop and get gasoline. (T. 172) During this phone call, S/A Stites believed Defendant would be distracted and took the opportunity to drive up alongside Defendant. (T. 174) S/A Stites was then able to positively identify Defendant. (T. 174) Defendant ended the conversation by stating he would notify S/A Stites when Defendant was around 15 minutes away from Harrah's Casino. (T. 172)

While this was going on, Trooper Morgan and other agents discussed the likely route Defendant would take into Cherokee, NC. (T. 21) Based on distance, the troopers presumed Defendant would come via Gatlinburg, TN. (T. 22) Thus, Trooper Morgan and other agents set up north of Cherokee, NC. (T. 22) Once situated, Trooper Morgan called S/A Stites to inform him of their position. (T. 22, 32)

Near Knoxville, TN, S/A Stites came into radio range and began communicating with Trooper Morgan, and everyone else on the channel, via radio. (T. 175) Over the radio, S/A Stites confirmed the vehicle Defendant was driving and that there was still a possibility of another suspect in a truck with Oregon plates. (T. 175)

At some point, it became clear to S/A Stites that Defendant would be driving down into Maggie Valley, NC, and taking US-19 into Cherokee, NC. (T. 174–75) This way into Cherokee goes over the Soco Mountain, which creates a radio and cellular deadzone. (T. 176) This was not the route Trooper Morgan and other agents had predicted Defendant would take. (T. 32–33) After being informed by S/A Stites, Trooper Morgan and other agents moved their setup to US-19, just east of Harrah's Casino. (T. 32) At some point either right before or in the deadzone, Defendant texted S/A Stites that he was on the "res." (T. 176) [Gov't Ex. 4] S/A Stites radioed once he received this text. (T. 177) This was the

last communication between S/A Stites' undercover persona "Joey" and Defendant. (T. 177)

### c. The Stop and Arrest of Defendant and Seizure of Marijuana.

At around 5:00 p.m. on March 6, 2018, Trooper Morgan had positioned his truck westward and parallel to US-19, near the Happy Holiday RV Campground—due east of Harrah's Casino. (T. 33, 75) As part of the operation, Trooper Morgan had another trooper stationed up a mile east from him. (T. 33) That trooper was to alert Trooper Morgan once he got a visual of Defendant. (T. 33) At around 5:20 p.m., Trooper Morgan was alerted that Defendant had been sighted heading west on US-19. (T. 33) Trooper Morgan turned his head over his left shoulder in anticipation of seeing Defendant. (T. 33) Just before Trooper Morgan saw Defendant, Morgan heard S/A Stites' radio that Defendant was on the reservation. (T. 34) Seconds later, Trooper Morgan saw Defendant driving a silver Chevy Silverado with a tonneau cover over the bed, and it appeared Defendant was texting while driving. (T. 34, 36, 77) [*But see* Gov't Ex. 16][4] There was another vehicle driving directly behind Defendant, so when Trooper Morgan pulled onto US-19 he was a vehicle behind Defendant. (T. 34) The vehicle behind Defendant eventually pulled off US-19 and that allowed Trooper Morgan to get directly behind Defendant. (T. 34) Soon thereafter, Trooper Morgan activated his blue lights and pulled Defendant over to the shoulder of US-19 near the Long House Funeral Home. (T. 35) [Gov't Ex. 16]

---

[4] The Court has reviewed the March 6, 2018, video created by Trooper Morgan's dashcam. [Gov't Ex. 17]. Based on the dashcam alone, it is not clear Defendant was texting while driving. As discussed later, however, this uncertainty does not alter the Court's analysis of whether to suppress the evidence.

With little room between traffic and the vehicles, Trooper Morgan approached Defendant's vehicle on the passenger side. (T. 35) Trooper Morgan said, "Sir, you can't text and drive in North Carolina." (T. 35) Defendant stated he was not texting. (T. 35) Trooper Morgan said he had seen Defendant texting back up the road. (T. 35) Defendant claimed he had been using his phone to search for a gas station. (T. 35) Trooper Morgan then asked Defendant to pull his truck forward so that Morgan could move his patrol car further from traffic. (T. 39) Additionally, Trooper Morgan knew there would be more responding units, so he wanted to make sure there was enough room for them as well. (T. 39)

Trooper Morgan asked for Defendant's license and registration. (T. 35) Defendant produced a Washington State driver's license and a paper bill of sale in lieu of registration. (T. 35) The bill of sale showed the Chevy Silverado had been purchased on March 3, 2018. (T. 37) To Trooper Morgan, the bill of sale gave credibility to the information Morgan had received from S/A Stites and from the morning briefing. (T. 37–38)

Trooper Morgan noted the truck's back windows were tinted and the exterior of the truck appeared clean. (T. 36) In the cab, Trooper Morgan observed no luggage but only a small bag in the back seat. (T. 36) Defendant's cellphone was in between the driver and passenger seats. (T. 36) While Trooper Morgan spoke with Defendant, Defendant's cellphone continued receiving text messages. (T. 36) Trooper Morgan pointed this out. (T. 36) Defendant grabbed his phone and flipped it over. (T. 36)

Trooper Morgan noticed there were empty water bottles and nutritional or energy supplements strewn about the cab. (T. 36–37) Because Defendant had stated he was

previously looking for a gas station, Trooper Morgan told Defendant there was a station a little way up the road. (T. 38) Defendant laughed in response. (T. 39)

At this point, Trooper Morgan, per CIU procedure, asked Defendant to come back to his patrol car to conduct an interview. (T. 40) In the patrol car Trooper Morgan could observe Defendant better and record the interaction on the dash camera. (T. 40) Defendant complied. (T. 40) Before getting into the patrol car, Trooper Morgan gave Defendant a protective pat down for weapons. (T. 40–41) Finding no weapons, Trooper Morgan allowed Defendant to sit in his patrol car and even allowed Defendant to keep his right leg hanging out the passenger door. (T. 41)

While checking Defendant's license and bill of sale, Trooper Morgan and Defendant chatted about various topics, including Defendant's travel from Washington, Defendant's race team in Kings Mountain, and Defendant's interest in going to Harrah's Casino. (T. 42–43) Trooper Morgan noted that Defendant kept his gaze out the passenger side window and responded to Morgan's questions "real quick." (T. 48) Trooper Morgan remarked that it appeared to be an extremely long trip for Defendant to undertake in such a short time. (T. 43) Defendant said he liked to drive. (T. 43) Defendant then stated he had stayed over in Cheyenne, WY, and in Nashville, TN. (T. 43) Defendant stated his reason for driving across the country was to deliver the truck he had recently purchased to his race team. (T. 43) Based on the information given to him by S/A Stites, Trooper Morgan believed this to be a lie. (T. 44) Trooper Morgan then wrote Defendant a citation for texting while driving. (T. 44) Defendant apologized for texting. (T. 44) Then Trooper Morgan asked Defendant who he had been texting. (T. 44) Defendant stated he had been texting his family, but he

now understood he was not to text and drive. (T. 45) Trooper Morgan handed back Defendant's license and bill of sale. (T. 45) Trooper Morgan asked if Defendant had any further questions. (T. 45) Defendant said he did not. (T. 45)

Then, Trooper Morgan asked Defendant if he had been arrested before or previously in trouble. (T. 45) Trooper Morgan told Defendant he seemed nervous because his stomach was churning, his laughing was odd, and his travel plans seemed suspicious. (T. 45) Defendant stated he needed to use the restroom because he had recently undergone a gastric sleeve operation. (T. 45, 94–95) Trooper Morgan admitted to Defendant that he did not believe it was just the surgery that was making Defendant's stomach churn. (T. 45) Trooper Morgan next asked Defendant about the insurance policy for the Chevy Silverado. (T. 45) Defendant said he had an insurance plan that covered him regardless of what car he drives. (T. 45) While such a policy exists, Trooper Morgan had never heard of this type of plan. (T. 47, 94)

Then, Trooper Morgan asked for consent to search Defendant's vehicle. (T. 49) Trooper Morgan provided Defendant with a NCHP vehicle search consent form. (T. 49) Trooper Morgan explained the form and allowed Defendant to read over it. (T. 49) Trooper Morgan then asked Defendant to sign the form. (T. 49) Defendant signed the form. (T. 50–51); [Gov't Ex. 3]

Trooper Morgan radioed to Trooper Shannon Williamson to come and conduct a K-9 search. (T. 52). It had previously been determined that Williamson would be the officer to show up and conduct a K-9 search of Defendant's truck. (T. 52) Again, Williamson had also been briefed that morning on the investigation into Defendant. (T. 51, 64) The K-9

alerted. (T. 52) [Gov't Ex. 16] Trooper Morgan then began a hand search of the truck while Williamson stayed behind looking after Defendant. (T. 52). As to not tip off Defendant, Trooper Morgan began his search in the cab even though he believed the marijuana to be in the truck bed. (T. 52–53)

Trooper Morgan obtained the keys for the vehicle from Defendant and attempted to unlock and open the tonneau cover. (T. 53) Trooper Morgan was unable to open the cover, however, this was due to user error. (T. 53) Trooper Morgan asked Defendant how he got into the truck bed. (T. 53) Defendant claimed he did not know and that he had never looked in the truck bed. (T. 53). Trooper Morgan radioed for Trooper Michael Childress to assist in opening the cover. (T. 53–54) Childress was able to help Trooper Morgan push the tonneau cover up high enough to release the tailgate allowing access to the bed. (T. 54) Trooper Morgan observed large black trash bags and a cardboard box. (T. 54) Trooper Morgan told Childress to go back and stand beside the patrol car where Defendant was still sitting. (T. 54) Trooper Morgan then opened one of the trash bags and saw green vegetation. (T. 54) Based on his training and experience, Trooper Morgan believed it to be marijuana. (T. 54) Trooper Morgan directed Childress to arrest Defendant.

Officers recovered nine large black garbage bags of marijuana, double-vacuum sealed. (T. 178) In total, the marijuana weighed 197 pounds. (T. 178) S/A Stites took samples and sent them to the DEA laboratory in Miami, FL. (T. 178)

Epilogue. After completing the wall-off traffic stop, Trooper Morgan wrote up a report. (T. 12) Per the direction of his supervisor, Trooper Morgan did not include everything he knew about the investigation into Defendant but only the details from the

traffic stop. (T. 12) [*See* Def. Ex. 1][5] Thus, much of Trooper Morgan's testimony at the July 12, 2018, hearing was not from his report. (T. 58) Trooper Morgan testified it is the general policy of the CIU to not include in its reports any intelligence it learns from other agencies. (T. 58) The CIU leaves it up to the other agencies to disclose information, otherwise, the CIU might inadvertently jeopardize an investigation. (T. 59, 70)

Regarding why a warrant was not sought, S/A Stites testified there were two reasons: 1) the investigation was fluid and constantly evolving; and 2) there was not a lot of time after obtaining the tag or VIN of Defendant's vehicle and positively identifying Defendant. (T. 184–86, 188)

## III. Discussion

### a. Legal Standards

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . .

U.S. Const. amend. IV.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-defined exceptions." Katz v. U.S., 389 U.S. 347, 357 (1967). For example, "the search of an automobile can be reasonable without a warrant." Collins v. Virginia, 584 U.S. ____, 138 S. Ct. 1663, 1669 (2018) (citing Carroll v. U.S., 267 U.S. 132 (1925)). This exception is based on the "ready mobility" of the automobile

---

[5] "Gov't Ex." followed by a number is Government's Exhibit entered into evidence at the July 12, 2018, hearing.

and "the pervasive regulation of vehicles capable of traveling on the public highways." <u>Id.</u> at 1669–70 (internal citations omitted). "When these justifications for the automobile exception "come into play," officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." <u>Id.</u> at 1670 (quoting <u>California v. Carney</u>, 471 U.S. 386, 392–93 (1985)); *see also* <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996).

"[P]robable cause is a flexible, common-sense standard." <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983) (plurality opinion). It is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Probable cause only requires that the available facts to an officer would "warrant a man of reasonable caution in the belief that certain items may be contraband . . . or useful as evidence in a crime." <u>Brown</u>, 460 U.S. at 742 (internal quotation omitted). "A "practical, nontechnical" probability that incriminating evidence is involved is all that is required." <u>Id.</u> (quoting <u>Brinegar v. U.S.</u>, 338 U.S. 160, 176 (1949)). "Because probable cause is an objective test, [a court] examine[s] the facts within the knowledge of arresting officers to determine whether they provide a probability on which a reasonable and prudent person would act." <u>U.S. v. Gray</u>, 137 F.3d 765, 769 (4th Cir. 1998). "[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists." <u>Ornelas v. U.S.</u>, 517 U.S. 690, 700 (1996).

"[O]nce police have probable cause, they may search "every part of the vehicle and its contents that may conceal the object of the search."" U.S. v. Kelly, 592 F.3d 586, 590 (4th Cir. 2010) (quoting U.S. v. Ross, 456 U.S. 798, 825 (1982)).

### b. Analysis

Defendant's Memorandum in Support of the Motion to Suppress was based in large part on Trooper Morgan's report (that did not mention the DEA investigation) and the dashcam video. [*See* # 26]. Defendant argued the evidence should be suppressed for two reasons: 1) Defendant did not break the law, therefore, there was not probable cause to stop Defendant; and 2) even if there were probable cause to stop Defendant for a traffic violation, Trooper Morgan extended the stop beyond constitutional limits. [# 26]. Defendant only learned of the DEA's investigation upon the Government's Response in Opposition. [# 29]. With the benefit of the Response, Defendant retailored his approach in his Reply by attacking Trooper Morgan's 'collective knowledge' of the DEA investigation and, at the hearing, Defendant put forth a policy argument that in this case, the Government should have sought a warrant beforehand. [# 30].

Trooper Morgan had Collective Knowledge of the DEA Investigation. The collective knowledge doctrine of the police "can be used . . . to establish probable cause even when the arresting officer himself does not have sufficient personal knowledge to independently establish probable cause." U.S. v. Joy, 336 F. App'x 337, 342 (4th Cir. 2009). If an officer has been in "communication with a group of officers that have collective knowledge of facts" leading to probable cause, then that officer, even without an independent knowledge of facts establishing probable case, may make an arrest. Id.; *see*

U.S. v. Laughman, 618 F.2d 1067, 1072 n.3 (4th Cir. 1980) ("[W]hen a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.").

Based on the evidence and testimony at the July 12, 2018, hearing, it appears S/A Stites had more than enough evidence to believe Defendant was violating 21 U.S.C. § 841(a)(1) and that there would be marijuana located in the bed of Defendant's truck. S/A Stites was in constant contact with his supervisor, Ziadie, and in closer contact with Trooper Morgan. S/A Stites told Trooper Morgan of the DEA's investigation into Defendant. S/A Stites asked the CIU about the possibility of stopping Defendant to conduct a wall-off stop. Trooper Morgan was the officer assigned the stop. In addition to his personal communication with S/A Stites, Trooper Morgan attended the March 6, 2018, morning briefing that again laid out the DEA investigation into Defendant. Afterward, S/A Stites and Trooper Morgan remained in constant contact, both by cellphone and then radio, as S/A Stites followed Defendant into Cherokee, NC. During this time, S/A Stites was able to ascertain the registration information of Defendant's truck and verify that it was in fact Defendant driving. And this information was relayed to Trooper Morgan.

The Court finds Trooper Morgan had the benefit of the collective knowledge of facts, from S/A Stites and Ziadie, that gave him probable cause to stop and search Defendant's truck for marijuana.

Defendant's argument is without merit because it addresses another strain of the collective knowledge doctrine. This other strain allows an officer without an independent factual basis to form probable cause to arrest a suspect based on being ordered to do so by another officer who does have such a basis to form probable cause. *See* <u>Joy</u>, 336 F. App'x at 342. Because Trooper Morgan had the benefit of the collective knowledge, another officer with personal knowledge of facts sufficient to establish probable cause was not required to order Trooper Morgan to stop and arrest Defendant.

<u>Defendant's Policy Argument</u>. At the hearing, Defendant argued that the Court should suppress the evidence because the Government could have obtained a warrant and by not doing so, and conducting a wall-off stop, the Government has asked the Court to participate in a charade. (T. 204) This would incentive the Government to seeks warrants in such future cases. (T. 206)

While the Court finds Defendant's argument admirable, this Court's inquiry is limited to whether the Government's conduct has run afoul of the Fourth Amendment. In this case, the Court finds the automobile exception applies, S/A Stites had probable cause to believe there would be marijuana in Defendant's truck, and Trooper Morgan had the benefit of collective knowledge. Accordingly, even though the Government did not seek a warrant, the Court finds the Government's actions did not violate Defendant's Fourth Amendment rights.

Finally, finding that Trooper Morgan had the benefit of collective knowledge and that there was probable cause to stop and search Defendant's truck, the Court dispenses with any analysis of whether Defendant violated N.C. GEN. STAT. § 20-137.4A and any

analysis of whether Trooper Morgan extended the stop beyond constitutional limits. These arguments appear to be moot.

## IV. Recommendation

The Court respectfully **RECOMMENDS** Defendant's Motion to Suppress [# 25] be **DENIED**.

Signed: September 4, 2018

Dennis L. Howell
United States Magistrate Judge

## Timeline for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within fourteen (14) days of service of same. Responses to the objections must be filed within fourteen (14) days of service of the objections. Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).